## SCHNEIDER *v.* SAUL

[No. 172, September Term, 1960.]

*Decided March 14, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, HORNEY and MARBURY, JJ.

*William Wells Beckett,* with whom were *T. Howard Duck-
ett, Nicholas Orem, Jr.,* and *Duckett, Orem & Christie* on the
brief, for the appellant.

*Cornelius Whalin* for the appellee.

HORNEY, J., delivered the opinion of the Court.

When the Circuit Court for Montgomery County found
for the defendant-seller (Helen McG. Saul) and entered a
judgment for costs in her favor against the plaintiff-buyer
(John E. Schneider) in the action brought by the buyer
against the seller for damages arising out of an alleged breach
of contract, the buyer appealed.

The buyer contends that the guarantee by the seller that
a building permit to erect a filling station could be secured
placed the responsibility for the delays in the issuance of the
permit on the seller for which the buyer was entitled to dam-
ages.

The case has been submitted to us, pursuant to Maryland
Rule 826 g, on a statement of the case in lieu of the plead-
ings and evidence (including by adoption the undisputed facts
set forth in the memorandum opinion of the trial court),
reading in pertinent part as follows:

>"The parties * * * hereby stipulate and agree to
>the following statement of the case in lieu of the
>pleadings and evidence:

1. To facilitate reference to the opinion of the court, counsel have taken the liberty of numbering consecutively the paragraphs thereof. Paragraphs 1 through 8 of the opinion state undisputed facts * * *."

[We insert at this point a brief summary of such undisputed facts in chronological order.]

([1] On May 16, 1956, the buyer contracted with the seller to purchase a parcel of land located in Prince George's County, on Riggs Road, near Sligo Creek Parkway, at a price of $29,950 payable in cash within thirty days. The contract contained other provisions to the effect that the buyer was to assume the obligations of performing under a lease to the Texas Company (Texaco); that the seller guaranteed that a building permit could be secured to erect a filling station on the property; that the seller was to remove the "Mack Snac" shack from the premises within thirty days after date of settlement; that the seller guaranteed that she would obtain a first deed of trust on the lot to be improved by the filling station in the amount of $42,000; that the buyer was guaranteed "reconfirmation of the lease" from Texaco; and that the seller would turn over to the buyer the contract of a builder (Mortenson) to erect a filling station in accordance with the plans of Texaco for $32,813. [2] On July 18, 1956, the application for a special exception to the zoning ordinance was granted by the County Commissioners, and "at that time a building permit could have been obtained by either the owner or the contract purchaser," but settlement was delayed until December 17, 1956. Upon the payment of the purchase price a deed was executed and recorded together with a deed of trust from the buyer to secure the Riggs National Bank for a loan of $42,000 to be used in erecting the filling station. [3] Shortly thereafter the buyer entered into a contract with another builder (Kettler) to construct the filling station at a substantial increase in

cost over the prior contract, and on January 2, 1957, the substituted builder applied for a building permit, but it was refused when, on February 8, 1957, the County Commissioners, on their own motion revoked the special exception previously granted. [4] When the buyer learned that the special exception had been revoked he employed an attorney to try to secure its reinstatement and the seller did likewise. [5] On June 11, 1957, mainly through the efforts of the buyer's attorney, the special exception was reinstated, the effect of which was to restore the right of the buyer to erect the filling station upon obtaining a building permit. [6] On June 28, 1957, the buyer entered into a new contract with the builder for the construction of the filling station at another increase in price over the previous contract, but before a building permit was obtained, the owner of the adjoining Esso station sued the County Commissioners, the building inspector, the seller and the buyer on a bill for an injunction to enjoin the issuance of the building permit and the erection of the filling station for the reason that the granting of the special exception was illegal in that it violated a set-back regulation. On a motion by the buyer for a summary judgment, the suit was dismissed on October 1, 1957. [7] However, when the application for a building permit was renewed, the State Roads Commission, on October 24, 1957, disapproved the issuance of the permit and the building plans on account of the layout of the entrances and exits. The negotiations with the Commission, which were begun promptly, continued until February 5, 1958, at which time, after modifications of the entrance and exit layouts, the erection of the filling station was approved by the Commission. [8] On April 8, 1958, the building permit was finally issued. Prior thereto the buyer had renegotiated a new lease with Texaco at an increased rental and had executed a final con-

tract with the builder. Construction of the filling station was begun on July 10, 1958, and was completed on January 1, 1959. In the meantime the loan from the Bank had been increased to $55,000. Within a short time after the building was completed, the plaintiff sold the property.)

"The opinion sets forth how the questions raised at [the] trial arose and the court's decision thereon. The principal question raised is stated by the court in paragraph 11 as follows:

'While the plaintiff alleges numerous breaches of the agreement, his principal complaint is that he was "to be guaranteed by the seller that a building permit can be secured for erecting a Texaco gasoline station," and that although the contract had been signed on May 15, 1956, he was unable to obtain the building permit until April 8, 1958, and then only through the efforts of his attorney.'

"In paragraph 16 of the opinion, the court rendered its decision of this question adverse to the plaintiff, and it is this adverse decision which is the basis of plaintiff's appeal."

"2. The following testimony hereinafter summarized was admitted into evidence at [the] trial:

"The [buyer], in testifying as to the occurrences at the time the contract was signed, testified to those matters set forth by the court in paragraphs 10 and 11 of the opinion—[to the effect that when he entered into the agreement he was induced to do so because he understood that the purchase of the property was a 'package deal' to secure a building permit immediately and a loan to erect the filling station already under contract to be occupied by Texaco under its lease of the premises, that is, that he thought he was 'all ready to go'; and that the delays which arose whereby the filling station was not completed until January 1, 1959, constituted a substantial breach of the contract by the seller, and as

a result the buyer suffered loss and damage through no fault of his own]—except that [the buyer] denied having any knowledge at the time the contract was signed that the [seller] had not obtained a special exception." [In addition to that part of paragraph 11 of the opinion hereinbefore quoted, the remainder reads thus: "The testimony shows, however, that promptly after the signing of the agreement the (seller) made application to the * * * County Commissioners for a special exception * * * which would enable the (buyer) to obtain his permit to build. * * * The (seller) testified that the (buyer) knew this was necessary when he signed the contract".]

\* \* \* \* \* \*

"James H. Carpenter [the adjoining Esso filling station owner], testifying as a witness for the [seller], stated that between the time the County Commissioners rescinded the special exception * * * and the time * * * [it] was reinstated, he and the [buyer] had a conversation in which Carpenter inquired into the possible purchase of the property from [the buyer]. * * * [That] Carpenter told the [buyer] he would not be interested in the property so long as The Texas Company had a lease on it. Carpenter then testified that the [buyer] suggested that he (Carpenter) approach one or more of the County Commissioners to encourage them not to support the reinstatement of the special exception.

"[The buyer], in rebuttal admitted the conversation with Carpenter, denied that he specifically suggested that Carpenter approach the County Commissioners, but did admit that there was some discussion about the fact that if the County Commissioners would not reinstate the special exception, then the lease with Texaco would go. The [buyer] thought that from this conversation Mr. Carpenter could have put 'two and two together.'"

The remainder of the statement of the case concerned the

theories of damages developed at the trial, but since we think the case must be affirmed, it would serve no purpose to set forth such theories in this opinion.

The trial court, in addition to finding that the building permit could have been obtained by either the seller or buyer at the time the special exception was originally granted on July 18, 1956, also found as a fact that none of the delays before the date of settlement was caused by the seller or resulted from lack of cooperation on her part, and concluded that there had not been a substantial breach of contract by the seller that would entitle the buyer to damages. As to the alleged delays after the final settlement, the trial court found that the revocation of the special exception by the County Commissioners was done on its own motion, that the injunction proceeding was inspired by the buyer himself apparently in an effort to void his lease with The Texas Company, that no one could have anticipated the delay caused by the disapproval by the State Roads Commission of the entrances and exits, and that there was no showing that the delay in removing the snack bar had damaged the buyer whatsoever.

Inasmuch as there was evidence to justify a finding that there had not been a breach of the contract by the seller, the trial court in so finding was not clearly erroneous, and we are therefore without authority to reverse the judgment for costs on the evidence. Rule 886. Moreover, it appears that the law supports the findings of the lower court on the evidence.

It is a fundamental principle of the law of contracts that delay in the performance of a contract will be excused whenever such delay is caused by the party objecting to the delay or seeking to recover damages therefor. 17 C. J. S., *Contracts,* § 505; 12 Am. Jur., *Contracts,* § 351; 3 Williston, *Contracts* (Rev. ed.), § 677; 6 Corbin, *Contracts,* § 1264. The cases in this and other jurisdictions support the texts. See, for example, *Iron Clad Mfg. Co. v. Stanfield,* 112 Md. 360, 76 Atl. 854 (1910) [the delay was the fault of the owner and was not a breach by the builder]; *Alois v. Waldman,*

219 Md. 369, 149 A. 2d 406 (1959) [when a duty is owed, the party owing it cannot prevail if the failure to perform operates to hinder or prevent performance]. See also *Adolphson v. Hixon,* 9 N. W. 2d 719 (Minn. 1943); *Giffels & Vallet Inc. v. Edw. C. Levy Co.,* 58 N. W. 2d 899 (Mich. 1953); *Melwin Construction Co. v. Stonewall Construction Co.,* 113 A. 2d 108 (D. C. Mun. App. 1955).

The record shows that settlement under the contract was due on June 16, 1956. It was further shown that the special exception was granted on July 18, 1956, and that at that time a building permit could have been obtained by the buyer had he applied for it, but, to suit his own convenience, the buyer chose to delay the settlement until December 17, 1956, and did not apply for a building permit until January 2, 1957. Under these circumstances, it is apparent that such delay as occurred prior to the date of settlement was the fault of the buyer and not the seller. Clearly the seller was not liable for damages because the buyer failed to act sooner than he did. It is likewise apparent that the seller was not in any way responsible for the delays occurring after the date of settlement which were caused by the revocation of the special exception and the filing of the injunction proceeding. The record is clear that the special exception was revoked by the Board of County Commissioners that had granted it, and the trial court found that the suit filed by the owner of the adjoining Esso station for injunctive relief was inspired, if not impelled, by the buyer.

Any contention that the delay occasioned by the objections of the State Roads Commission to the entrance and exit layouts is attributable to the seller under the guarantee clause of the contract is without merit. The Commission made no objection to the entrance-exit layouts until long after the buyer could have obtained the building permit.

Finally, with respect to the failure of the seller to remove the snack bar within the time limited by the contract, it may be that the buyer had a technical cause of action for damages, under *Speed v. Bailey,* 153 Md. 655, 139 Atl. 534 (1927), in that the question of the materiality of a breach

is usually one of fact, but in this case where the record shows —and the trial court found as a fact though it probably could have decided the point as a matter of law—that the non-removal of the shack had not substantially interfered with the erection of the filling station even after construction had been begun, we think it is clear that the buyer was not damaged, and we so hold. See *Vincent v. Palmer,* 179 Md. 365, 19 A. 2d 183 (1941) ; *K & G Construction Co. v. Harris,* 223 Md. 305, 164 A. 2d 451 (1960).

The judgment for costs must be affirmed.

> *Judgment affirmed; appellant to pay costs.*